**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| HOWLINK GLOBAL LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | CASE NO. 2:22-cv-00040-JRG-RSP |
| v. | § | (Lead Case) |
| | § | |
| AT&T, INC., et al. | § | JURY TRIAL DEMANDED |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| HOWLINK GLOBAL LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 2:22-cv-00042-JRG-RSP |
| | § | (Member Case) |
| VERIZON COMMUNICATIONS, INC., et al., | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

**PLAINTIFF HOWLINK'S OPENING CLAIM CONSTRUCTION BRIEF**

**Cited documents and abbreviations**

Appendix A:  Chart showing parties' proposals (App. A)

Ex. 1:  U.S. Patent No. 8,630,279 ('279 patent)

Ex. 1A:  excerpts from '279 prosecution history ('279 prosecution)

Ex. 2:  U.S. Patent No. RE46,415 ('415 patent)

Ex. 3:  U.S. Patent No. 9,596,576 ('576 patent)

Ex. 4:  Declaration of Dr. Mahdi Eslamimehr ("Eslamimehr decl.")

# Table of Contents

I.    Introduction .......................................................................................................... 1

II.   The '279 patent .................................................................................................... 1

A.    Overview ....................................................................................................... 1

B.    Disputed terms and phrases. ........................................................................ 2

1.    "downlink signal" ............................................................................ 2

2.    "synchronization durations within a downlink frame" .............. 3

3.    "formed by a concatenation of…" ................................................ 4

a.    During prosecution history, the applicants equated
"concatenation" with "combination." ............................................... 5

b.    The claim language and the specification demonstrate that
an arrangement of the combined codes is required. ........................ 7

c.    Defendants cannot defend their position .......................................... 9

4.    "a cell identifier…". ...................................................................... 10

5.    the "generator" and "applier" phrases .................................... 11

6.    "first carrier group" / "second carrier group" ....................... 13

III.  The '415 patent .................................................................................................. 14

A.    Overview ..................................................................................................... 14

B.    Disputed terms and phrases. ...................................................................... 15

1.    "call signal". ................................................................................. 15

2.    "BSC / BTS matching unit" terms and phrases ....................... 16

3.    "IP address controller" ............................................................... 19

4.    "buffer state monitor" ................................................................ 19

5.    "an IP interface" .......................................................................... 20

IV.   The '576 patent .................................................................................................. 21

A.    Overview ..................................................................................................... 21

B.    Disputed terms and phrases. ...................................................................... 22

1.    the preambles ............................................................................... 22

2.    "femtocell base station" ............................................................. 23

3.    "close subscriber group (CSG)" ................................................ 23

4.    "determination unit," "request unit," and "packet routing unit" .............. 24

V.    Conclusion. ........................................................................................................ 26

## Table of Authorities

**Cases**

*Aventis Pharms. Inc. v. Amino Chems. Ltd.*,
  715 F.3d 1363 (Fed. Cir. 2013) ........................................................................ 3

*Blue Spike LLC v. Grande Communs. Inc.*,
  No. 4:20-CV-671, 2021 U.S. Dist. LEXIS 211010 (E.D. Tex. Nov. 2, 2021) .......... 6

*Estech Sys. v. Burnco Tex. LLC*,
  No. 2:20-cv-00275-JRG-RSP, 2021 U.S. Dist. LEXIS 114668
  (E.D. Tex. June 18, 2021) ................................................................................ 10

*Mobile Equity Corp. v. Walmart Inc.*,
  No. 2:21-CV-00126-JRG-RSP, 2022 U.S. Dist. LEXIS 13326
  (E.D. Tex. Jan. 25, 2022) ................................................................................. 23

*Nagravision SA v. Comcast Cable Communs. LLC*,
  No. 2:16-CV-1362-JRG, 2017 U.S. Dist. LEXIS 187475
  (E.D. Tex. Nov. 13, 2017) ................................................................................. 7

*Optis Wireless Tech. LLC v. ZTE Corp.*,
  No. 2:15-cv-300-JRG-RSP, 2016 U.S. Dist. LEXIS 52657
  (E.D. Tex. Apr. 19, 2016) ............................................................................ 19, 26

*Panoptis Patent Mgmt., LLC v. Blackberry Ltd.*,
  No. 2:16-CV-62-JRG-RSP, 2017 U.S. Dist. LEXIS 16650
  (E.D. Tex. Feb. 6, 2017) .............................................................................. 19, 26

*Parthenon Unified Memory Architecture LLC v. Apple Inc.*,
  No. 2:15-cv-00621-JRG-RSP, 2016 U.S. Dist. LEXIS 78935
  (E.D. Tex. June 16, 2016) ................................................................................. 21

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................... 7

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
  853 F.3d 1370 (Fed. Cir. 2017) .......................................................................... 6

*RightQuestion, LLC v. Samsung Elecs. Co.*,
  No. 2:21-CV-00238-JRG, 2022 U.S. Dist. LEXIS 71237
  (E.D. Tex. Apr. 18, 2022) ................................................................................... 2

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
  948 F.3d 1342 (Fed. Cir. 2020) ........................................................................ 10

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ........................... 10

## I.     Introduction.

Plaintiff Howlink asserts three distinct telecommunications patents against Defendants AT&T and Verizon, whose vendors Nokia and Ericsson have intervened.  The patents were developed by industry-leading researchers in South Korea.  Generally, they cover the following:

(1) '279 patent:  generating downlink signals at the base station that contain unique synchronization signals that allow the mobile devices to efficiently and accurately identify and connect with the correct base station for wireless LTE service.

(2) '415 patent:  formatting and transmitting signals between base stations, base station controllers, and the rest of the core wireless network, using a novel architecture that allowed the carriers to transition from legacy 2G systems to 3G and LTE (4G) networks.

(3) '576 patent:  using femtocells (small base stations that expand the coverage of the wireless network) to provide different levels of service and access to private networks, such as a corporate intranet.

Most of the parties' disputes concern Section 112, ¶ 6, with Defendants liberally, and inaccurately, categorizing many claim terms and phrases as means-plus-function, and then in several instances attempting to invalidate the claims for supposedly lacking structure.  In other instances Defendants seek no construction, claiming that the plain and ordinary meaning applies, but they have not identified any basis for disputing that Howlink's proposals are correct and do in fact represent the plain and ordinary meaning.  And then there are a handful of terms that Defendants seek to construe and simply construe incorrectly.  We start with the '279 patent.

## II.     The '279 patent

### A.     Overview.

U.S. Patent No. 8,630,279, entitled "Method for Generating Downlink Signal, and Method for Searching Cell," was developed by a group of researchers at the prestigious

Electronics and Telecommunications Research Institute (ETRI) in South Korea, including inventor Seung-Chan Bang, a world-renown and a prolific researcher and inventor, who is now the President of ETRI.  It claims methods and apparatuses that allow a mobile device to quickly and reliably identify and connect with a cell tower to initiate wireless service or handoff service from one cell tower to another.  Some claims read on the cell tower's generation of the downlink signal—the signal sent from the cell tower to the mobile device, with encoded information identifying the cell tower.  Other claims read on the mobile device's receipt of that encoded transmission.  All claims are infringed by Defendants' implementation of the LTE (4G) standards and their 5G Non-stand Alone (NSA) networks (which utilize their LTE infrastructure).

### B. Disputed terms and phrases.

For several disputed terms and phrases, Howlink proposes a construction and Defendants contend that no construction is necessary because the plain and ordinary meaning applies.  The problem is that Defendants have not disclosed what they believe the plain and ordinary meaning of the disputed language is or whether they actually dispute that Howlink's proposals represent the plain and ordinary meaning.  For the remaining disputes, Defendants assert indefiniteness positions that they will be unable to support.

### 1. "downlink signal"

Claim 1 recites: "A method for generating a downlink signal."  The parties contend:

| Howlink | Defendants |
| --- | --- |
| signal transmitted from a base station to a mobile station | no construction necessary; plain and ordinary meaning |

Howlink's construction represents the plain and ordinary meaning.  *RightQuestion, LLC v. Samsung Elecs. Co.*, No. 2:21-CV-00238-JRG, 2022 U.S. Dist. LEXIS 71237, at *6 (E.D. Tex. Apr. 18, 2022) ("When construing claims, 'there is a heavy presumption that claim terms

2

are to be given their ordinary and customary meaning.'" (quoting *Aventis Pharms. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013)).   The term "downlink signal" is well-known in the art and is used by the patent according to its ordinary meaning—to refer to a signal that is sent down from the base station to the user's mobile device (which the patent refers to as a "mobile station").[1]   The specification confirms Howlink's interpretation.   The "downlink signal" is generated and transmitted by the base station and then received by the mobile station.   '279 Figs. 6-9 (showing generation and transmission of downlink signal by the base station); Figs. 12-13 (showing receipt and processing of downlink signal by the mobile station).

Defendants contend that no construction is needed.   However, they have not identified what they consider to be the plain and ordinary meaning or whether it differs from Howlink's construction.   Either they agree that Howlink's construction represents the plain and ordinary meaning and should stipulate to that meaning, or they will need to show why our construction is incorrect—which they will be unable to do.

### 2.    "synchronization durations within a downlink frame"

Each independent claim of the '279 patent (claims 1, 7, 13, 19, and 25) includes this phrase.   For example, method claim 1 includes: "allocating the plurality of unique cell identification code groups to a plurality of <u>synchronization durations within a downlink frame</u>, respectively."   '279 claim 1 at 18:13-15 (underline added).   The parties' positions are as follows.

| Howlink | Defendants |
|---------|------------|
| periods of time within a downlink frame during which synchronization signals are transmitted | no construction necessary; plain and ordinary meaning |

A "downlink frame" is a radio frame having a time interval (typically of 10 milliseconds) that is used to transmit the downlink signal from the base station to the mobile station.   Examples

---

[1] An "uplink signal," conversely, is a signal sent from the mobile station up to the base station.

of these frames are shown in Figures 1-3.  Portions of the downlink signal constitute "synchronization signals," which are used by the mobile device to synchronize itself with the base station so it can be authenticated and properly decode the signals provided by that base station and receive service.  Thus, portions of the downlink frame must be reserved for transmitting the portions of the downlink signal that contain synchronization signals, as shown by the "synchronization blocks" in Figures 1 and 2; col. 5:32-34 ("As shown in FIG. 1, a downlink frame 10…includes four synchronization blocks"); col. 5:42-46 ("As shown in FIG. 2…a synchronization block…includes a synchronization duration 13"); col. 6:4-6 ("As shown in FIG. 3, a subframe 12…includes a synchronization duration 13"); Fig 3. (item 13).  Accordingly, Howlink's proposal correctly specifies that the claimed "synchronization durations" are "periods of time…during which synchronization signals are transmitted."  Again, Defendants will not be able to identify any flaw in our construction or any reason not to adopt it.

### 3.    "formed by a concatenation of…"

Each independent claim of the '279 patent recites a "first code group" and a "second code group."  The first code group is "formed by a concatenation of a first cell identification code and a second cell identification code," and the second code group is "formed by a concatenation of the second cell identification code and the first cell identification code."  These phrases appear in claim 1, as an example, as follows:

1.    A method for generating a downlink signal, comprising:

   generating a plurality of unique cell identification code groups; and

   allocating the plurality of unique cell identification code groups to a plurality of synchronization durations within a downlink frame, respectively,

   wherein the plurality of unique cell identification code groups comprise a first code group which is **formed by a concatenation of a first cell identification code and a second cell identification code**,

4

wherein the plurality of unique cell identification code groups further comprise a second code group which is **formed by a concatenation of the second cell identification code and the first cell identification code**,

wherein the first code group is different from the second code group, and wherein the concatenation of the first cell identification code and the second cell identification code represents cell identification information.

'279 claim 1 (emphasis added).

Howlink construes these phrases as shown below, while Defendants claim no construction is necessary.

| Howlink | Defendants |
|---|---|
| formed by an arrangement that combines a first cell identification code and a second cell identification code | no construction necessary; plain and ordinary meaning. |
| formed by an arrangement that combines the second cell identification code and the first cell identification code | |

Howlink's proposal leaves most of the claim language as is but explains that—in the context of these phrases—"a concatenation of" means "an arrangement that combines."  Thus, the claim requires a "first code group which is formed by *an arrangement that combines* a first cell identification code and a second cell identification code," and "a second code group which is formed by *an arrangement that combines* the second cell identification code and the first cell identification code."  This construction will aid the jury's comprehension of what is likely to be an unfamiliar term (concatenation).  Moreover, it comports with the ordinary meaning of the claim language, Eslamimehr decl. ¶¶ 19-23, and is compelled by the intrinsic record.

### a. During prosecution history, the applicants equated "concatenation" with "combination."

During prosecution, the applicants distinguished a cited reference (Jamal) by explaining that the reference did not combine two cell identification codes, as is done in the '279 claims.  That was the important point:  that the two things that were combined in Jamal (framing

synchronization information and long code indicating information) were not "cell identification codes."  In doing so, the applicants additionally equated "combination" and "concatenation":

> "In other words, Jamal merely discloses the combined code $c_{s/lci}$ where framing synchronization information and long code indicating (lci) information are combined but does not teach **the concatenation of two cell identification codes, i.e., the combination of two cell identification codes**.

Ex. 1A ('279 prosecution), April 17, 2012 Response at 9 (emphasis added).[2]

In that same response, the applicants also added new claims that included the "concatenation" phrases.  *Id.* at 2-7.  These new claims reflected the applicants' preference at that time for using "concatenation" instead of "combination," but their remarks also show that the applicants considered the term concatenation to be indistinguishable from the type of combining (in a specific arrangement) that the claims recite.  *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1376 (Fed. Cir. 2017) ("A patentee's use of 'i.e.,' in the intrinsic record, however, is often definitional… Indeed, the term 'i.e.' is Latin for *id est*, which means 'that is.'" (internal citations omitted)); *Blue Spike LLC v. Grande Communs. Inc.*, No. 4:20-CV-671, 2021 U.S. Dist. LEXIS 211010, at *122 (E.D. Tex. Nov. 2, 2021) ("[T]he Federal Circuit has recognized that 'i.e.' usually signals a definition." (internal citation omitted)).

The Examiner initially took the position that the specification did not support the "concatenation" phrases.  Ex. 1A, April 30, 2012 Advisory Action at 3.  But the applicants disputed this position and demonstrated that, while the specification does not use the word "concatenation," it discloses numerous embodiments in which cell identification codes are combined in different arrangements.  *Id.*, May 16, 2012 Response at 9-10.[3]  The Examiner was

---

[2] Exhibit 1A has PDF "bookmarks" allowing the Court to navigate among the constituent documents.  Page citations in this brief are to the internal pagination of those documents.

[3] For reference, the specification similarly does not use "combine" (or any of its variations) when discussing the formation of the code groups

persuaded and subsequently issued a Notice of Allowability, following the entry of Examiner amendments (which are not relevant to the concatenation phrases). *Id.*, September 5, 2013 Notice of Allowability, Examiner Amendment.

Accordingly, the prosecution history confirms that the applicants used "concatenation" to mean an arranged "combination."

> **b.    The claim language and the specification demonstrate that an arrangement of the combined codes is required.**

Howlink's proposal is phrased as it is ("an arrangement that combines") because the concatenation phrases require more than just any combination of the cell identification codes; rather, the codes must be combined in an arrangement that makes the code groups unique or different.  This is compelled by the claim language itself and the specification.

"[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Nagravision SA v. Comcast Cable Communs. LLC*, No. 2:16-CV-1362-JRG, 2017 U.S. Dist. LEXIS 187475, at *35 (E.D. Tex. Nov. 13, 2017) ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms, and the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." (internal quotation marks and citations omitted)).  In the '279 claims, the surrounding claim language specifies that:

(1) "a plurality of <u>unique</u> cell identification code groups" are generated; '279 claim 1, col. 18:11-12 (emphasis added); and

(2) "the first code group [that is formed by a concatenation *a first* cell identification code and *a second* cell identification code] <u>is different from</u> the second code group [that is formed by a concatenation of *the second* cell identification code and *the first* cell identification code]." *Id.*,

col. 18:24-27 (emphasis added).

Thus, even though the first code group and the second code group contain the same constituents—the first cell identification code and the second cell identification code—they are nonetheless "unique" and "different" from each other, and the claims specify two different arrangements of the first cell identification code and the second cell identification code. That means it cannot be enough to simply combine the two codes in any manner, they must be combined or arranged in such a way as to make them non-identical. Because of the arranged nature of the combination, this concatenation scheme can allow for the creation of two, unique cell identification code groups from only two constituent cell identification codes. As a result, additional codes or sequences are not needed to distinguish the code groups from one another.

To illustrate, let's say the first cell identification code is represented by "A" and the second cell identification code is represented by "B." If we combine these two codes to make a first code group of "AB," then the second code group cannot also be "AB," because then it would be the same as the first code group. Rather, the second code group must combine or arrange the two codes in such a way that the second code group is different from the first code group. In this example, that could mean that instead of "AB" the second code group would arrange the codes into a second code group of "BA."

This interpretation is also confirmed by the specification, which includes several embodiments showing this type of arrangement or combination of the codes. For example, the below passage shows an arrangement of four "unique cell identification code groups":

> According to a method for generating a downlink signal of the third exemplary embodiment of the present invention, the downlink frame is generated such that the unique cell identification code group and the frame synchronization identification sequence is arranged as in the following Equation 5.
>
> $[((m,k),0), ((m,l),0), ((l,m),0), ((k,m),0)]$     *(Equation 5)*

> In Equation 5, **(m,k), (m,l), (l,m), and (k,m) denote unique cell identification code groups** arranged in four synchronization durations according to the third exemplary embodiment of the present invention, and 0 denotes an index number of the frame synchronization identification sequence applied to the four synchronization durations.

'279 col. 9:20-33 (emphasis added).

The individual codes are represented by "m," "k," and "l." The first and last code groups (shown as (m,k) and (k,m)) contain the same constituent codes (m and k), but those codes are not just combined. Rather, they are also arranged in a manner (in this example, in reverse order) that makes the code groups unique and different from each other—that's why the patent describes the first and fourth code groups as "unique," even though they contain the same constituent codes. The same is true of the second and third code groups, which combine codes m and l but arrange them in reverse order. These are thus examples of "unique cell identification code groups" that are "formed by an arrangement that combines a first cell identification code [e.g. "m"] and a second cell identification code [e.g., "l"].

### c.    Defendants cannot defend their position.

Defendants contend that no construction is necessary because the plain and ordinary meaning applies. However, Defendants have not identified what they contend the plain and ordinary meaning of the "concatenation" phrases to be. Nor have they identified any way in which Howlink's proposal differs from or conflicts with the plain and ordinary meaning or is otherwise incorrect.

* * *

For these reasons, and because the term "concatenation" will likely be unfamiliar and potentially confusing to a jury, the Court should construe the "concatenation" phrases and adopt Howlink's proposal.

### 4.    "a cell identifier…"

Independent claim 13 recites "An apparatus for searching a cell" that includes "a cell identifier for obtaining cell identification information based on at least one of the plurality of unique cell identification code groups." '279 claim 13, col. 19:16-21.  The parties contend:

| Howlink | Defendants |
|---|---|
| Not governed by § 112, ¶ 6; no construction necessary | Governed by § 112, ¶ 6,<br>• Function:  obtaining cell identification information<br>• Structure:  indefinite |

This phrase is not governed by Section 112, ¶ 6.  Because the "cell identifier" phrase "does not contain the words 'means for,' there is a rebuttable presumption that section 112, paragraph 6, does not apply to the limitation." *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1353-54 (Fed. Cir. 2020) (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015)).  "That presumption can be overcome, but only 'if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* (*quoting Williamson* at 1349).  "The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function." *Estech Sys. v. Burnco Tex. LLC*, No. 2:20-cv-00275-JRG-RSP, 2021 U.S. Dist. LEXIS 114668, at *21 (E.D. Tex. June 18, 2021) (internal citation omitted).  Defendants cannot meet their burden of overcoming this presumption.

One of ordinary skill in the art would understand that the claimed "**cell identifier**" is part of the claimed "apparatus for searching a cell," which is part of a mobile station.  Fig. 12 (item 260); col. 10:42-46 ("As shown in FIG. 12, the mobile station 200 includes a downlink signal

receiver 210….and a cell identifier 260"); col. 13:10-14 ("The cell identifier 260 extracts a unique cell identification code group…and identifies a cell by correlating it with a plurality of unique cell identification codes").  Eslamimehr decl. ¶¶ 24-27.  In other words, the cell identifier is a component in the mobile station that performs an act that is well understood to occur in cellular communications—the obtaining of cell identification information that is needed for the mobile station to identify and connect with base stations in the network.  *Id.*  This is a well-known and definite structure found in every mobile station.  *Id.*  The presumption that Section 112, ¶ 6 does not apply remains intact.

Moreover, because the existing claim language is reasonably accessible to a lay person and clear in its meaning, it need not be further construed.

### 5.    the "generator" and "applier" phrases

Claim 19 recites in part:

19.    An apparatus for generating a downlink frame in a wireless communication system, the apparatus comprising:

a generator for generating a plurality of unique cell identification code groups; and

an applier for allocating the plurality of unique cell identification code groups to a plurality of synchronization durations within a downlink frame, respectively,…

'279 claim 19, col. 20:1-7.  The parties contend:

| Howlink | Defendants |
|---|---|
| "*a generator for*…":<br><br>not governed by § 112, ¶ 6;<br>no construction necessary<br><br>"*an applier for*…":<br><br>not governed by § 112, ¶ 6;<br>no construction necessary | "*a generator for*…":  governed by § 112, ¶ 6,<br>• Function:  generating a plurality of unique cell identification code groups;<br>• Structure:  indefinite<br><br>"*an applier for*…": governed by § 112, ¶ 6,<br>• Function:  allocating the plurality of unique cell identification code groups to a plurality of synchronization durations within a downlink frame, respectively;<br>• Structure:  indefinite |

11

These phrases are also not governed by Section 112, ¶ 6.  One of ordinary skill in the art would understand that the claimed "**generator**" **and** "**applier**" **are** part of the claimed "apparatus for generating a downlink frame," which is part of the cellular network infrastructure. Eslamimehr decl. ¶¶ 28-31.  For example, the patent explains:

- "As shown in FIG. 6, an apparatus for generating a downlink signal 100 includes <u>a downlink frame generator 110,…a frame synchronization applier 130</u>, and a transmitter 140," col. 6:64-67; Fig. 6 (emphasis added):



- "Firstly, <u>the downlink frame generator 110</u> generates a downlink frame as shown in FIG. 1 to FIG. 3 (S110)," col. 7:4-5; Figs. 1-3.

- "The frame synchronization <u>applier 130</u> generates the downlink signal by applying a plurality of frame synchronization identification sequences to the synchronization durations 13 of the signal on the time-axis generated by the IFFT calculator 120 (S230)." Col. 7:21-25.

In other words, the "generator" and "applier" are—just like the calculator and transmitter depicted in Figure 6—components in the base station that perform acts that are well understood to occur in cellular base stations (i.e., the generation of cell identification code groups and the application of those code groups to portions of the downlink frames transmitted by the base station).  Eslamimehr decl. ¶ 30.  These are well-known and sufficiently definite structures in the

12

mobile network.  The presumption that Section 112, ¶ 6 does not apply remains intact.[4]

And again, because the existing claim language is reasonably accessible to a lay person and clear in its meaning, it need not be further construed.

### 6.    "first carrier group" / "second carrier group"

Several dependent claims (claims 3, 4, 15, 16, 21, and 22) recite "a first carrier group" and a "second carrier group."  For example, claim 3 recites:

> 3. The method of claim 2, wherein elements of the first cell identification code in the first OFDM symbol duration is allocated in a <u>first carrier group</u> and elements of the second cell identification code in the first OFDM symbol duration is allocated in a <u>second carrier group</u>.

'279 claim 3, col. 18:31-35 (emphasis added).

| Howlink | Defendants |
|---|---|
| first group of radio frequencies<br><br>second group of radio frequencies | Indefinite |

The downlink signals described in the '279 patent have a time dimension and a frequency dimension, referred to as the "frequency domain."  Col. 6:39-47 ("a plurality of unique cell identification codes . . . may be arranged in a frequency domain of the common synchronization channel as shown in FIG. 3").  As used in the '279 claims, a "carrier group" is a "group of radio frequencies" that are used to transmit information from the base stations in the cellular network.  Eslamimehr decl. ¶¶ 32-35.  This interpretation is confirmed by the surrounding claim language, which states that elements of a cell identification code in a "OFDM [orthogonal <u>frequency</u> division multiplexing] symbol duration" are allocated to a "carrier group."  *Id.*; col. 1:11 (defining OFDM).  And it also comports with the specification's use of "subcarriers" (a type of carrier) to refer to radio frequencies.  Col. 5:29-31 ("In FIG. 1, the horizontal axis is a time axis,

---

[4] The prosecution history further supports Howlink's position, as the "generator" and "applier" terms were added at the insistence of the Examiner to ensure that claim 19 was sufficiently structural. Ex. 1A ('279 prosecution), September 5, 2013 Examiner-Initiated Interview Summary, Examiner Amendment at 5.

and the vertical axis is a frequency axis or a subcarrier axis" (emphasis added)); col. 15:28-30 ("When an available band of the synchronization channel is 1.25 MHz the number of all available subcarriers is approximately 38.").  FIG. 3 (annotated below) provides an illustrative example of the carrier groups.  It shows a first cell identification code C$^{(p)}$ that is allocated to a first group of radio frequencies (shown in yellow), and a second cell identification code C$^{(q)}$ that is allocated to second group of radio frequencies (shown in green).



Defendants will not be able to rebut our construction or provide any basis for finding these claim terms indefinite.

## III.    The '415 patent

### A.    Overview.

U.S. Patent No. RE46,415 is entitled "Low-Cost Network System Between a Base Station Controller and a Base Transceiver Station, and Method for Transmitting Data between Them."  The patent was developed by industry leading researchers at KT Corporation (formerly Korea Telecom, the second largest wireless service provider in South Korea).

The '415 patent discloses and claims systems and methods that allowed wireless service providers to transition more efficiently and economically from legacy 2G networks to their IP-based 3G and LTE (4G) networks.  The legacy networks used dedicated lines (such as copper T1 wires) to connect the base station (traditionally called a "base transceiver station" or "BTS") with the base station controller (or "BSC"), which controls the base stations and provides access to the "core" network, including the mobile switching center and other elements in the "core network."

The newer networks (like LTE) are IP-based and typically use fiber optic lines to connect the base stations (or eNodeBs) to the core network and to route voice and data within the core network.  To allow wireless service providers to mitigate the time and cost of replacing all those copper wires with fiber optic lines, the '415 inventors came up with a middleman solution.  The lines immediately out of the base station and immediately into the base station controllers would remain dedicated (e.g., copper), but sitting physically and logically in between the base station and base station controller would be "matching units."  These matching units would receive the T1 copper transmissions from the base transceiver station or base station controller and then convert them to IP traffic that could be transmitted over an IP network using non-dedicated lines (such as fiber optic lines).  Conversely, the matching units would also receive IP traffic from the fiber optic lines and convert it to dedicated-line T1 signals transmitted to the BTS or BSC.

This novel architecture allowed the existing base stations and base controller stations, and many miles of copper wires, to still be used (and not immediately replaced) and integrated with the new core networks that consisted only of IP, fiber optic wires, resulting in tremendous cost savings for AT&T and Verizon as they gradually deployed their LTE networks.

**B.      Disputed terms and phrases.**

**1.      "call signal"**

Claim 1's system includes a "base transceiver station (BTS) configured to communicate a call signal with a mobile terminal.  '415 claim 1, col. 8:21-22.  The parties contend:

| Howlink | Defendants |
|---|---|
| telecommunications signal containing a voice or data communication | no construction necessary; plain and ordinary meaning |

Howlink's proposal reflects the ordinary meaning of call signal and is supported by the specification, which describes the transmission in a cellular network of a "voice/fax signal" and other data signals.  E.g., '415 col. 4:17-37.  Defendants cannot identify any error in our proposal.

### 2. "BSC / BTS matching unit" terms and phrases

The independent claims recite a "BSC matching unit (BSCMU)" (claims 1, 17, 19) or "base station controller matching unit (BSCMU)" (claims 16, 18). The claims also recite a "BTS matching unit (BTSMU)" (claims 1, 16, 18) or a "base transceiver station matching unit (BTSMU)" (claims 17, 19). Claim 19 additionally recites a method step of "at the BSCMU, receiving one of an Internet protocol (IP) signal and a dedicated-line data signal and outputting the other signal…" '415 claim 18, col. 10:23-32. Defendants contend that each of these terms and phrases is governed by Section 112, ¶ 6, and for each term they propose claimed functions and corresponding structure. App. A at 3-6. Defendants will not meet their burden on this issue.

The particular arrangement of words in these claim terms, and the associated acronyms, may not commonly appear outside of the '415 patent. But that does not render them "nonce" or "placeholder" terms that lack meaning or structure; it simply means the applicants arranged well-known words in a particular manner that is not identically replicated elsewhere. That is not enough to rebut the presumption that Section 112, ¶ 6 does not apply.

Let's look at the constituent words of these terms, each of which is well-known and used according to its ordinary meaning. A "base station controller" (or "BSC") is an element in a cellular network that controls base stations and serves as an interface between the base stations and the mobile switching center (MSC) and the rest of the core network. A "base transceiver station" (or "BTS") is another name for a base station. Fig 1 (emphasis added):



T[...] refers to making a match of two or more different things, or associating with each other—for example, matching copper T1 lines with IP lines. *See, e.g.*:

The present invention relates to a low-cost network system that can reduce the network cost by connecting a base station controller (BSC) with a base transceiver station (BTS) by the use of <u>matching units that match a dedicated line such as an E1/T1 line to an IP line such as a digital subscriber line</u> (DSL).

'415 col. 1:26-31 (emphasis added).

Another aspect of the invention provides a method for transmitting data that can improve the efficiency of data transmission at less expense by installing <u>matching units that can match an El/T1 dedicated line with an IP line and convert an E/T1 signal and an IP packet mutually</u>."

*Id.*, col. 1:50-54 (emphasis added).

Figure 2 shows where the "matching units" fit in the network architecture:



Fig. 2 (emphasis added).

The specification also explains and depicts the components and functions of these units, which are nearly identical except for differences that account for their respective locations in the network. For example:

In one embodiment, <u>the BSCMU comprises</u>: a transceiver for communicating the dedicated-line data signal with the BSC; a converter for converting the dedicated-line data signal transmitted by the BSC into the IP signal and the IP signal transmitted by the BTSMU into the dedicated-line data signal; an IP interface for communicating the IP signal with the BTSMU; and a controller for controlling the transceiver, the converter, and the IP interface.

*Id.* col. 2:14-21 (emphasis added).

In one embodiment, <u>the BTSMU comprises</u>: a transceiver for communicating the dedicated-line data signal with the BTS; a converter for converting the dedicated-line data signal transmitted by the BTS into the IP signal and the IP signal transmitted by the BSCMU into the dedicated-line data signal; an IP interface for communicating the IP signal with the BSCMU; and a controller for controlling the transceiver, the converter, and the IP interface.

*Id.* col. 2:35-42 (emphasis added); Figs. 4, 5.

And finally, the claims themselves recite with specificity how the matching units function and interact with the other elements of the wireless network.  For example, claim 1 recites:

> 1.    A system for signal processing in a mobile communication system, comprising:
>
> ***
>
> **_a BSC matching unit (BSCMU)_**, being <u>connected to the BSC</u> through a first dedicated line, <u>configured to</u> convert a first dedicated-line data signal transmitted by the BSC into a first set of IP packets and convert a second set of IP packets into a second dedicated-line data signal to be transmitted to the BSC; and
>
> **_a BTS matching unit (BTSMU)_**, being <u>connected to</u> the BTS through a second dedicated line, <u>configured to</u> convert the first set of IP packets into the first dedicated-line data signal to be transmitted to the BTS and convert the second dedicated-line data signal transmitted by the BTS into the second set of IP packets to be transmitted to the BSCMU, wherein the BTSMU is further configured to communicate the IP packets with the BSCMU via an IP network.

'415 claim 1, col. 8:19-43 (emphasis added).

Accordingly, while the terms "BSC matching unit" and "BTS matching unit" may not, in that particular syntax, commonly appear in technical or other references outside the patent, the meaning of these terms is clear and clearly connotes structure:  these are computing devices installed in the wireless network to connect the base station controller and the base transceiver, respectively, with the fiber optic IP network, by converting transmissions from copper T1 lines to IP packets, and vice versa.  Therefore, as was the case in *Optis Wireless*, where the Court addressed various "unit" terms asserted to be means-plus-function terms, the Defendants here will not be able to meet their burden of showing Section 112, ¶6 applies or that any further construction is necessary.  *Optis Wireless Tech. LLC v. ZTE Corp.*, No. 2:15-cv-300-JRG-RSP, 2016 U.S. Dist. LEXIS 52657, at *79-80 (E.D. Tex. Apr. 19, 2016) ("'Determination unit,' like 'reception unit' and 'transmission unit,' connotes structure.  Even if the term 'determination unit'

does not in isolation connote sufficiently definite structure, the claim connotes structure to one of

skill in the art by reciting details of how the unit functions as part of the claim."); *Panoptis*

*Patent Mgmt., LLC v. Blackberry Ltd.*, No. 2:16-CV-62-JRG-RSP, 2017 U.S. Dist. LEXIS

16650, at *12-22 (E.D. Tex. Feb. 6, 2017) (adopting and expanding on *Optis Wireless* analysis).

### 3.    "IP address controller"

Claims 8 and 14 recite:  "an IP address controller configured to maintain an IP address of

the IP network."  Howlink construes this phrase, Defendants do not.

| Howlink | Defendants |
|---|---|
| memory that stores or maintains an IP address of the IP line | no construction necessary; plain and ordinary meaning |

Howlink's proposal should be adopted.  While the term "controller" typically connotes a

component that "controls" something, the claims and the specification make clear that the recited

IP address controller is memory located within the "BTSMU" that "maintains an IP address"

(i.e., an instance of data).  Claim 8, col. 9:7-10; claim 14, col. 9:43-46; col. 2:27-29 ("the

BSCMU further comprises an IP address controller for maintaining an IP address of the IP line

connecting the BSCMU with the BTSMU").

### 4.    "buffer state monitor"

Claim 21 includes "a buffer state monitor configured to produce buffer state data relative

to a current state and a maximum storing capacity of the buffer to be transmitted to the

BSCMU."  Claim 21, col. 10:55-58.  Claim 23 recites the same limitation except the

transmission is to the BTSMU.  Claim 23, col. 10:64-67.  The parties contend:

| Howlink | Defendants |
|---|---|
| not governed by Section 112, ¶ 6;<br><br>No construction necessary | Governed by Section 112, ¶ 6.<br>• Function:  produce buffer state data relative to a current state and a maximum storing capacity of the buffer to be transmitted to the [BSCMU/BTSMU]<br>• Structure:  indefinite |

19

Defendants cannot meet their burden of showing Section 112, ¶ 6 applies.  Nor does their indefiniteness contention hold water.  The "buffer state monitor" of claim 21 is expressly recited as part of the "BSCMU," col. 10:54-55, and the "buffer state monitor" of claim 23 is expressly recited as part of the "BTSMU."  Col. 10:53-64; *see also* col. 2:23-26 ("And, the BSCMU further comprises a buffer state monitor for producing buffer state data relative to a current state and a maximum storing capacity of the buffer to be transmitted to the BTSMU"); col. 2:43-47 ("The BTSMU further comprises a buffer state monitor for producing buffer state data relative to a current state and a maximum storing capacity of the buffer to be transmitted to the BSCMU.") And because Defendants concede that both of those elements (the BSCMU and the BTSMU) have structure in the specification, they will be unable to demonstrate that the buffer state monitor sub-components of these elements are themselves lacking in structure.

### 5.    "an IP interface"

Dependent claim 4 recites that the *BSCMU* includes "an IP interface configured to communicate the first and second set of IP packets with the <u>BTSMU</u>."  '415 claim 4, col. 8:58-60 (emphasis added).  Dependent claim 10 recites that the *BTSMU* similarly includes "an IP interface configured to communicate the first and second set of IP packets with the <u>BSCMU</u>."  '415 claim 10, col. 9:26-28 (emphasis added).  The parties contend:

| Howlink | Defendants |
|---|---|
| Not governed by Section 112, ¶ 6; No construction necessary | Governed by Section 112, ¶ 6.<br>• Function:  communicate the first and second set of IP packets with the BTSMU/BSCMU<br>• Structure:  IP interface 140 as described at 7:1-2 of the '415 Patent, and equivalents thereof |

Defendants will again be unable to meet their burden of showing Section 112, ¶ 6 applies. "IP" is a well-known acronym that refers to Internet Protocol and the IP "packets" (transmission blocks) sent using that protocol.  An "interface" is commonly understood in the fields of

telecommunications and data transmission to refer to a connection point between networks or devices. *See, e.g.*, *Parthenon Unified Memory Architecture LLC v. Apple Inc*., No. 2:15-cv-00621-JRG-RSP, 2016 U.S. Dist. LEXIS 78935, at *33 (E.D. Tex. June 16, 2016) ("The Court construes 'interface' to mean 'hardware, or hardware with software, that forms a link between devices and allows them to communicate with each other.'"). That is how the term is used in the '415 patent.

The IP interfaces of claims 4 and 10, are the portions of the base station controller matching unit and base transceiver station matching unit, respectively, that receive and transmit IP data packets from and to the IP network that sits between the base station controller and the base transceiver station. This is set forth in the claims themselves ('415 claim 4, col. 8:58-60; '415 claim 10, col. 9:26-28), and also confirmed by the specification. For example:

- "the BSCMU comprises…an IP interface for communicating the IP signal with the BTSMU," col. 2:14-20;

- "the BTSMU comprises…an IP interface for communicating the IP signal with the BSCMU," col. 2:35-41.

- "an IP matching unit 200 is installed at BTS and receives IP packets, which are transmitted through IP network, by an IP interface 210," col. 6:33-34;

- "The IP interface 140 transmits the converted IP packets to the IP matching unit 200 through IP network." Col. 7:1-2.

*See also* Figs. 4 and 5.

Accordingly, the "IP interface" terms (and surrounding "configured to…" language) should be accorded their ordinary meaning and should not be rewritten as "means" terms.

**IV.    The '576 patent**

**A.    Overview.**

U.S. Patent No. 9,596,576, entitled "Providing Services According to Subscription Status of User Equipment," was also developed by and issued to KT Corporation (formerly Korea

21

Telecom). The '576 patent relates to the use of "femto" or "micro" cells. These are essentially small cellular base stations that (unlike traditional base stations, that tower over communities like trees) can be deployed in corporate and educational campuses, and even in homes, to expand the coverage area of the cellular network. In the '576 patent, the femtocells distinguish between different categories of devices based on the networks and network services that those devices are permitted to access. For example, certain mobile devices may be given a *private* IP address to access a *private*, enterprise network (such as a corporate intranet), whereas other devices that are not permitted such access may be given a *public* IP address so that the device instead accesses a *public* network, such as the Internet. Defendants employ the claimed femtocells in their own wireless networks and in those of their corporate or enterprise customers, allowing them to expand their network coverage, control access privileges to private networks and services, and collect significant subscription fees.

### B. Disputed terms and phrases.

#### 1. the preambles

Independent claims 1 and 15 recite: "A method for providing different levels of service by a femtocell base station according to a subscription status of user equipment…" and "A femtocell base station for providing different levels of service according to a subscription status of user equipment…," respectively. To the extent Defendants take this position simply because "femtocell base station" first appears in the preamble, this is a non-dispute. Both sides construe that term, as discussed next below. To the extent Defendants contend the preambles are otherwise limiting, they are wrong. As the Court has recognized:

> Courts determine whether to treat a preamble as a claim limitation [based] on the facts of each case in light of the claim as a whole and the invention described in the patent. Preamble language that merely states the purpose or intended use of an invention is generally not treated as limiting the scope of the claim. Similarly, [i]f the body of the claim sets out the complete invention, the preamble is not

ordinarily treated as limiting the scope of the claim.

*Mobile Equity Corp. v. Walmart Inc.*, No. 2:21-CV-00126-JRG-RSP, 2022 U.S. Dist. LEXIS 13326, at *11 (E.D. Tex. Jan. 25, 2022) (internal quotation marks and citations omitted). Defendants will not be able to meet this standard, as is demonstrated by the simple fact that they do not even propose a construction for the preamble (i.e., state how it is limiting).

### 2.    "femtocell base station"

This term is found in all claims, either directly or by dependency.  The parties contend:

| Howlink | Defendants |
|---|---|
| small cellular base station | A customer-premises equipment that connects a 3GPP UE over a wireless air interface to a mobile operator's network using a broadband IP backhaul |

Defendants will not contest that Howlink's proposal is accurate.  '576 col. 1:23-27 ("A femtocell may denote a small service area covered by a femtocell base station" with a range that may be "about 10 meters.").  But they will similarly be unable to defend the narrowing limitations that they propose; that the femtocell base station be "customer-premises equipment" and that it must use a "broadband IP backhaul" to connect to the wireless network.  There is nothing in the ordinary meaning of "femtocell base station" that requires it to be deployed on "customer-premises" alone, and not also within the network of the wireless service provider, nor that requires "a broadband IP backhaul" be used to connect the femtocell to the network.

### 3.    "close subscriber group (CSG)"

This term is in all claims, directly or by dependency.  For example, method claim 1 includes "determining whether the <u>user equipment</u> coupled to the femtocell base station is a closed subscriber group (CSG) member or a non-CSG member based on subscription information of the user equipment."  '576 claim 1, col. 11:34-40 (emphasis added).   The parties contend as follows:

| Howlink | Defendants |
|---|---|
| a group of user equipment having connectivity access to a femtocell or a group of femtocells | a group of subscribers of an operator who are permitted to access one or more cells of the PLMN but which have restricted access |

Howlink's proposal tracks the claim language itself and comports with the specification, which states that "[t]he CSG may be a group of <u>user equipment</u> that is allowed to access to one specific femtocell or a group of femtocells." '576 col. 1:48-50 (emphasis added). In contrast, Defendants' proposal has three flaws. First, it incorrectly identifies the constituents of the group as "subscribers" as compared to subscriber *devices* (or "user equipment"), which the specification and the claims clearly identify as the group members (as emphasized above). Second, Defendants' proposal references "the PLMN." Neither this acronym or its underlying phrase is recited in the claims or referenced in the specification. Third, Defendants' proposal states that the closed subscriber group members have "restricted access." The opposite is true— it's the *non*-CSG member devices whose access is restricted. '576 col. 1:59-62 ("[A] femtocell base station…may restrict non-CSG member user equipment from accessing the femtocell base station."); col. 2:2-5 ("non-CSG member user equipment cannot access the public Internet network because it is restricted from accessing the femtocell base station.").

### 4.    "determination unit," "request unit," and "packet routing unit"

Independent claim 15 recites a "femtocell base station" that includes:

- "<u>a determination unit</u> configured to determine whether user equipment coupled to the femtocell base station is a closed subscriber group (CSG) member or a non-CSG member based on subscription information of the user equipment,"  and

- "<u>an IP request unit</u> configured to allocate a private IP address to user equipment determined as the CSG-member and to allocate a public IP address to user equipment determined as the non-CSG member."

'576 claim 15, col. 12:61-13:2.

Dependent claim 16 recites "a femtocell base station" that includes:

24

> "a packet routing unit configured to: route packets having the private IP address between the user equipment determined as the CSG member and an Intranet network associated with the private IP address; and route packets having the public IP address between the user equipment determined as the non-CSG member and an Internet network associated with the public IP address.

'576 claim 16, col. 13:7-16.

Defendants contend that each of these phrases is governed by Section 112, ¶ 6 and is indefinite for lack of corresponding structure. App. A at 8-10. They will again fail to meet their burden, particularly since each of these "unit" terms is recited by the claims to be part of a "femtocell base station," which indisputably connotes structure, and is described as such throughout the specification. For example:

- "[A] femtocell base station may include a determination unit and an IP request unit. **The determination unit may be configured to** determine whether user equipment coupled to the femtocell base station is a closed subscriber group (CSG) member or a non-CSG member based on subscription information of the user equipment. **The IP request unit may be configured to** allocate a private IP address to user equipment determined as the CSG-member and to allocate a public IP address to user equipment determined as the non-CSG member." Col. 3:37-46 (emphasis added).

- "**The determination unit is configured to** collect the subscription information of the user equipment from at least one of a subscriber server and the user equipment, to extract an allowed CSG list from the subscription information of the user equipment, to determine the user equipment as the CSG member when the allowed CSG list includes a CSG identity of the femtocell base station, and to determine the user equipment as the non-CSG member when the allowed CSG list does not include the CSG identity of the femtocell base station." Col. 3:55-64 (emphasis added).

- "***The IP request unit may be configured*** to request a packet data network gateway to allocate the private IP address to the user equipment determined as the CSG member and to allocate the public IP address to the user equipment determined as the non-CSG member, to receive one of the private IP address and the public IP address from the packet data network gateway, to assign the user equipment determined as the CSG member with the private IP address, and to assign the user equipment determined as the non-CSG member with the public IP address." Col. 3:65-5::7 (emphasis added).

- "The femtocell base station may include a packet routing unit. ***The packet routing unit may be configured*** to route packets having the private IP address between the user equipment determined as the CSG member and an Intranet network associated with the private address, and to route packets having the public IP address between the

user equipment determined as the non-CSG member and an Internet network associated with the public IP address." Col. 3:47-54 (emphasis added).

- Figure 2:



Accordingly, given the specificity with which the "determination unit," "request unit," and "packet routing unit" are described in the claims and in the specification, Defendants will be unable to show that these terms do not sufficiently connote structure and are therefore subject to Section 112, ¶ 6 and indefinite.  *Optis Wireless*, 2016 U.S. Dist. LEXIS 52657, at *79-80 (E.D. Tex. Apr. 19, 2016) ("Even if the term 'determination unit' does not in isolation connote sufficiently definite structure, the claim connotes structure to one of skill in the art by reciting details of how the unit functions as part of the claim."); *Panoptis,* 2017 U.S. Dist. LEXIS 16650, at *12-22 (E.D. Tex. Feb. 6, 2017).

## V.    Conclusion.

For the foregoing reasons, the Court should adopt Howlink's positions and proposed constructions and reject those of Defendants.

Date:  January 13, 2023                    Respectfully submitted,

By:  */s/ Jeff Eichmann*
John Jeffrey Eichmann (CA 227472)
**EICHMANN, a professional corporation**
662 N. Sepulveda Blvd., Suite 300
Los Angeles, California 90049
310-237-9190 (tel.)
jeichmann@eichmann.com

Kate E. Cassidy (Admitted Pro Hac Vice)
NY Bar. No. 4380747

Prashanth Chennakesavan (Admitted Pro Hac Vice)
Cal. Bar No. 284022
LTL ATTORNEYS LLP
152 W 57th Street, 19th Floor
New York, New York 10019
Telephone: (332) 244-7015
Facsimile: (213) 612-3773
Email: kate.cassidy@ltlattorneys.com
Email: prashanth.chennakesavan@ltlattorneys.com

Dat Nguyen (Admitted Pro Hac Vice)
Cal. Bar No. 280755
LTL ATTORNEYS LLP
300 S. Grand Ave., 14th Floor
Los Angeles, California 90071
Telephone: (213) 612-8900
Facsimile: (213) 612-3773
Email: dat.nguyen@ltlattorneys.com

S. Calvin Capshaw
Elizabeth DeRieux
Texas Bar No. 03783900
CAPSHAW DeRIEUX, LLP
114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: (903) 845-5770
Email: ccapshaw@capshawlaw.com
Email*: ederieux@capshawlaw.com*

*Attorneys for Howlink Global, LLC*

## Certificate of Service

I certify this document is being served on counsel of record on the date listed above via the ECF filing system.

*/s/ Jeff Eichmann*